# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**DAVID ZAK**,                                      Chapter 7
     Debtor                              Case No. 15-10098-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LISA REED,**
     Plaintiff
v.                                                  Adv. P. No. 15-1064
**DAVID ZAK,**
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the four-count Amended Complaint filed by Lisa Reed ("Reed" or the "Plaintiff")[1] against David Zak ("Zak," the "Defendant," or the "Debtor"). The Plaintiff seeks to except obligations she alleges are owed to her by the Defendant from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (4), and (6).[2] The Court conducted a two-day trial commencing on March 28, 2017 at which three witnesses testified and 33 exhibits were introduced into evidence by agreement.

---

[1] Lisa Reed is also know as Elizabeth Reed.

[2] The Plaintiff's Amended Complaint is poorly pled as she lumps claims under § 523(a)(4) and (a)(6) together in Counts One through Three.

The issues presented include whether the Plaintiff has established that the Defendant is obligated to her for monies owed arising out of the involuntary dissolution of a partnership she had with a corporation known as Loan Modification Group, Inc. ("LMG"), an entity solely owned and controlled by the Defendant, and, if so, whether she has sustained her burden of establishing that any such obligations are excepted from the Debtor's discharge.

For the reasons set forth below, the Court concludes the Plaintiff has sustained her burden of proof under both 11 U.S.C. § 523(a)(4), and (a)(6) as the Defendant was the alter ego of LMG and is personally liable for torts he committed in his capacity as sole officer, director, and shareholder of LMG.

## II. FACTS[3]

Reed testified that she first became acquainted with Zak in 2008 or early 2009 when he contacted her to collect monies she owed to Jonathan Friedmann, Esq. ("Attorney Friedmann") who together with Zak had represented her in conjunction with her real estate business, which she referred to as Mass Lending, as well as with respect to legal problems associated with a scheme she engineered to defraud mortgage lenders.[4]  She

---

[3] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").

[4] The Court takes judicial notice of the docket in United States of America v. Elizabeth Reed, Crim. No. 11-10229-PBS.  The criminal information filed in the United States District Court for the District of Massachusetts contains references to Mass Lending, LLC, a mortgage loan origination business owned and operated by Reed located in East Boston, Massachusetts at which Reed worked as mortgage broker, and Mass Equity Holdings, Inc., a real estate business solely owned by Reed.  Reed executed a Waiver of

2

testified that she was "working for a loan modification company on the side" and asked

Zak if he would be "interested in doing a loan modification on his condo in Cambridge."

According to Reed, she raised the subject of a loan modification business. Zak indicated

to her that he was very interested in such a venture, particularly when she informed him

that "it was a lucrative business that could explode." Reed further testified that she and

Zak agreed to work together. At trial, she testified about their venture as follows:

> Well, me and David had nothing at the time. It was just me and him and so
> any profits that we did make we would be splitting 50/50. At that time we
> didn't have very much to split, so we just agreed on maybe a per file fee
> that he was paying me because, like I said, we didn't have a lot coming in
> at that time. And then, you know, every decision that the business was
> going under we would do it together. Any decisions we -- any hirings that
> we did, any decisions as to how we would proceed moving forward with
> the business, it was always me and him together.

In February of 2009, Zak incorporated LMG, identifying himself as president,

treasurer, secretary, director and sole shareholder in the Articles of Organization. At the

time, Zak was operating Zak Law Offices, P.C. ("ZLO"), a professional corporation he

incorporated in 2007. Reed took credit for naming LMG, stating "I actually came up with

the name and it was a company formed based off of our advisor, Jonathan Friedmann,

who was always -- he was an advisor on board for us telling us that we needed a company

to [sic], under ZLO's umbrella, so we can take payments for loan modification clients."

Reed testified about the trajectory of the business:

---

Indictment and consented to the proceeding by information. She also entered into a plea
agreement. On July 8, 2013, Judge Joseph Tauro sentenced her to a prison term of 18
months, together with supervised release for three years, and ordered her to pay
restitution of $2,080,100.00.

At the beginning of the year, it was really slow. We were just starting out.
We were going through my client files. We were hiring small amounts of
staff here and there in what we called agents, our independent contractors
that brought in customers from different ethnic backgrounds. Most likely
the Hispanic community and the Haitian community were the ones that
were hit more so that [sic] any other communities, so we brought in agents
that knew that community very well. And once we did that our business
almost tripled or quadrupled. But of course, it took time but it went pretty
quickly. And then David started doing radio advertisements, which then
escalated the business even more so. So at that time the profits started
rolling in and David and I are making decisions together, like we normally
did, decided that I should be paid a split profit of the company since it was
doing that well. And we decided once the business was up and running,
we never thought it would actually get to that extent until a few months
into the business and we saw what was happening. And it was per
David's suggestion that I get paid the 50 percent of the business at that
time because I was equal partner. I was doing all the hiring. I was doing
all the analysis. I was running all the employees.  David's job was --
basically was more so a radio personality at that point. I was taking care
of all the loan modifications coming in and out of the company.

Prior to LMG's incorporation, Reed solicited homeowners in financial distress

who were either having difficulty paying their mortgages or facing foreclosure.  ZLO

paid her a referral fee of $1,000 for each client that she referred to the law firm.  In June

of 2009, once the business became established, Reed's arrangements with LMG and ZLO

changed and she began receiving, primarily through her nominees (her nephew and a

company she owned and controlled), 50% of the profits of the loan modification business.

ZLO's payments to Reed's nominees were the result of her legal and financial problems.

According to Reed,

Well, loan modification [LMG] basically took in the clients and analyzed all
the paperwork that came in for that loan modification to see if it was a
viable client to begin with.  And when we found that it was a viable client,
meaning if their payments were too high that we can actually make some
reduction to that payment, then we would proceed to taking the client in

4

and taking in payments and doing all the analyzing paperwork and the
predatory lending letters.

Well, they [ZLO] were doing the -- the whole predatory lending side of it.
So we would take in a file and then analyze the paperwork and then ZLO
would do the violations of the client's home and we would write the 93(a)
letter for that client.

In furtherance of that business model, LMG and ZLO required the execution of fee

agreements by clients that typically required them to make an advanced payment of

$2,500.  LMG was described in those contracts in different ways.  For example, a form fee

agreement executed on April 9, 2009 by Jose Vasquez, and David Zak, as President of

LMG, referred to LMG as a wholly owned subsidiary of ZLO.   The fee agreement

provided in pertinent part the following:

2. Legal Services to be Provided.  . . .

☐ LOAN MODIFICATION [ONE MORTGAGE]":

The services to be provided by LMG, its attorneys, affiliates, agents and
associates working in concert with it either directly or indirectly to the
Client shall be the :

1) Preparation and processing of loan modification application documents
and disclosures;
2) Analysis and preparation of comprehensive Forensic Loan File Analysis;
3) Negotiation of loan modification with borrower's respective lender or
mortgage servicing company.

FOR LOAN MODIFICATION SERVICES IN CONNECTION ONE [sic]
MORTGAGE LOAN, CLIENT SHALL REMIT TWO CONSECUTIVE MONTHLY
PAYMENTS OF $2,500 OR ONE PAYMENT OF $5,000.   THE SECOND
PAYMENT SHALL BE DUE WITHIN THIRTY DAYS OF RECEIPT OF RECEIPT
[sic] OF THE FIRST PAYMENT. . . .

3. FEES. Client will pay to LMG a flat fee to be assessed as stated above.
Payment of said fee shall be made in either one payment or two payments
as the borrower prefers.  In the event that two payments are made, the first

payment shall be made upon the signing of this agreement and the second payment shall be due thirty (30) days from that date. . . .

> In the event that two payments are made, the first payment shall be applied solely to the processing, analysis and production of a forensic audit of the loan file which shall include all applicable state and federal violations and the production of a Lender-Benefit Analysis.  This payment shall be non-refundable upon the completion of these services.

> The second payment shall be applied solely to the correspondence and negotiation with the respective lender's attorneys and/or loss mitigation departments.  This payment shall be non-refundable upon the completion of these services.

(emphasis in original).

Fee agreements executed by homeowner Yanko Matias on October 5, 2009 and by homeowner Dayanet Aviles on November 28, 2009, differentiated the services to be provided by ZLO and LMG, now referred to as Loan Modification Group of Massachusetts ("LMGM"), and described LMGM in the document as "an analytic consulting company supervised and managed" by ZLO.  For LMGM's services the clients agreed to pay a $2,500 fee as reflected in the following form of agreement:

> For the completion of the above analytic research services LMGM shall collect a fee . . . in the amount of $2,500.00.  SAID FEE SHALL BE DEPOSITED UPON THE COMPLETION OF SERVICES 1 AND 2 REFERENCED-ABOVE WITH SERVICE 3 TO BE PERFORMED WITHIN SEVEN (7) BUSINESS DAYS OF PAYMENT RECEIPT UNLESS OTHERWISE AGREED TO BY THE CLIENT.

> Should the client elect to obtain representation by legal counsel in the advocacy of client's loan modification petition with client's lender or mortgage servicing company, LMGM shall refer the matter to Zak Law Offices, PC, which shall coordinate and/or reserve the right to outsource the legal representation of said loan modification work to another law firm which shall represent client in a legal capacity.

Zak executed the agreement on behalf of LMGM.

Zak explained the reasons why the fee agreements changed, testifying as follows:

Because we wanted to be more and more specific about disclosures to the clients, everything from non-guarantee disclosures to the cost of litigation, to making it clear in more detail what the specific services were within the scope of loan modification because that's a very broad term that encompasses many things.

He also explained why ZLO was not initially a signatory to the fee agreement. He stated:

First of all, the clients -- the initial point of entry was into LMG offices in Revere, so the underlying fee agreement was between LMG and the client. However, within the fee agreement -- and this was reflected in further upgrades -- they had the option of retaining Zak Law Offices as well at the same time to do the advocacy portion of the loan modification. So to the extent that the point of entry for the consumer was the Loan Modification Group offices in Revere, which were different from Zak Law Offices which were in Needham, that's why there was -- that's the first reason. The second reason is because it was disclosed to the consumer and it was also in the letterhead that LMG and ZLO were working in tandem as -- in general. Of course, they could go to a different law firm, but they were working in tandem, so that's why.

As noted above, Reed received 50% of the profits of the loan modification business beginning in June of 2009. Zak testified as to the reason for the profit sharing:

Because of the fact that the companies had grown so large and there were so many agents that I needed someone to manage them and to supervise them and train them and I thought that she could do the job and because she came to me and said that "If you don't give me 50 percent I will take all your agents and set up another competing company."

As part of her duties, Reed prepared so-called "production reports," which she described as follows:

So this production report was based off of a software that we paid on a monthly basis called QuickBase. We would input all of our client's information into the software and it would help us with the day-to-day activities as to tracking the file. At the end of every month, I would produce

a production report that would show what came into the business, who made first payments, who made second payments, what was due, so on and so forth.

Reed added: "We were exploding at that point." She estimated that there were 700-900 clients at the end of 2009.

The production report for December 2009, which was introduced as an exhibit, revealed that 10 agents, one of whom was not identified, procured 52 clients and collected $121,250 in payments which "cleared" on or after December 1, 2009 with an additional sum of $265,850 to be collected in the future. Attorney Friedmann, who was assisting ZLO, also was involved in preparing so-called production reports as his name is prominently displayed on the January 2010 report. According to that report (Exhibit 21), $106,650 in second payments cleared in December with respect to 41 loans for which a total of $228,200 was collected. Thus, there were substantial profits from the loan modification business to be distributed to Reed, directly or indirectly, and to Zak.

ZLO issued checks, signed by Zak, to Reed for her share of the partnership profits. Notably, emails relating to the disbursements showed that Reed and Zak were sharing the profits equally. For example, an email from "Gymbab@aol.com" to Reed and Zak provided: "$34K to David and $34K to Lisa." Similarly, an email dated December 2, 2009 from Maryann O'Connor to Reed and Zak provided: "Take $39,280.21 Each."

In other words, profits were not shared by LMG and Reed, but by Zak and Reed. Some of Reed's distributions, as noted above, were made by checks payable to her nephew, Chris Amarilla, and others were made payable to American Union Corporation, an entity which Reed owned and controlled. According to Reed, Attorney Friedmann

8

advised her not to have checks issued in her name because of her pending legal problems.[5]  During the second half of 2009, Reed was receiving a salary and a share of profits as follows:  in July 2009, ZLO issued checks to Chris Amarilla totaling $17,277.51; in August 2009, it issued a check to Reed in the sum of $4,250 and a check to Amarilla in the sum of $6,081; in September 2009, it issued checks to Amarilla in the total sum of $24,000, although a memo indicated that Reed and Zak would each receive $34,000; in October 2009, ZLO issued a check to American Union Corporation in the amount of $50,000; in November 2009, it issued a check to American Union Corporation in the sum of $36,220.22; and in December of 2009, it issued a check to that entity in the sum of $40,500.

During its existence, LMG was a profitable enterprise.  Despite the profitability of the partnership, however, Zak, on January 4, 2010, arranged to have Reed escorted out of the building by an off duty police officer without prior notice to her.  Accordingly, Reed's affiliation with LMG, ZLO and Zak abruptly terminated, notwithstanding the action taken on January 5, 2010 when Maryann O'Connor, on behalf of Zak, forwarded Reed a check in the sum of $11,803.30 for December 2009, representing all or part of her share of profits for that month.

In response to her exclusion from the business, Reed immediately contacted an attorney.  On January 8, 2010, Reed, through her attorney, sent a letter to "Dear Attorney

---

[5] As noted above, Reed had operated a business known as "Mass Lending."  On June 16, 2011, the United States filed a criminal information setting forth charges of money laundering and wire fraud in connection with a scheme to defraud mortgage lenders. Reed entered into a plea agreement, and served a prison term of 18 months.

Zak," although her attorney addressed the letter to both Zak, individually, and ZLO.  In the letter, Reed's attorney represented that she and Zak, individually, verbally agreed to operate as a partnership and that Reed believed it was Zak's "intention to unilaterally and wrongfully exclude her from all aspects of the partnership's affairs."  Citing Mass. Gen. Laws ch. 108A, §§ 1-49, Reed sought immediate inspection of the books and records of the partnership and an immediate and formal accounting of all partnership affairs.  In addition, she advised Zak "to hold in trust all profits derived from the affairs of the partnership until this dispute is resolved, pursuant to M.G.L. c. 108A, Section 21."

On February 25, 2010, ZLO, LMG and Tradix Associates, Inc. commenced an action against Reed in the United States District Court for the District of Massachusetts seeking injunctive relief against Reed to prevent her from "copying, accessing, using, interfering with or infringing upon the copyright of the software program below described and that they be awarded monetary damages, compensatory and punitive, plus attorneys fees and court costs and expenses."[6]  The software program referenced in the complaint pertained to ZLO's use of the application "to perform legal services relating to mortgage modification for clients."  In the complaint, the plaintiffs represented that, with ZLO's consent, LMG used the so-called QuickBase Application and agreed to pay Tradix $100 for services in connection with each mortgage modification file it processed using the application.  Notably, the parties represented that in March of 2009, "defendant

---

[6] The Court takes judicial notice of Complaint filed in Zak Law Offices, P.C. et al. v. Reed, C.A. No. 1:10-cv-1033-LTS (D. Mass. 2010), as well as other pleadings on the court docket.

10

Reed assumed the title of Vice-President, Customer Service, that she obtained a password enabling her to access the QuickBase Application, and that, after her termination, she reproduced the application.

Reed answered the complaint and filed a seven-count counterclaim against ZLO and LMG, asserting that she was a partner with both entities and alleging, *inter alia*, that ZLO and LMG owed her a fiduciary duty with respect to the operation of the partnerships and that those entities breached the partnership agreements "by failing to share profits earned and profits to be earned in the future."[7]  On July 18, 2011, after a four-day trial and the dismissal of the complaint in its entirety, as well as resolution of other counts by agreement, United States Magistrate Judge Leo T. Sorokin entered judgment in favor of Reed and against LMG as to counts II through VI of her counterclaim in the amount of $423,538.38, consisting of $414,000.00 in damages, plus prejudgment interest in the amount of $7,649.36, and costs in the amount of $1,889.02.  He also entered judgment in favor of ZLO and LMG on Count VII of the Counterclaim and in favor of ZLO on Counts II through VI.

The jury, in response to Special Verdict Questions, determined that a partnership existed between Reed and LMG, but not between Reed and ZLO.  The jury indicated that it was awarding Reed $18,000 per month for eighteen months as her "partnership profit share" ($324,000 total), and $5,000 per month for eighteen months as a "salary" ($90,000 total), for a total award of $414,000. The eighteen-month period on which the award was

---

[7] Zak was neither a plaintiff in the federal district court action nor named as a defendant by Reed in her counterclaim.

based encompassed the period of time from Reed's expulsion from LMG to the date of trial.

LMG filed a motion captioned "Motion for a Judgment as a Matter of Law after Trial." The district court denied the motion finding that "[o]n the evidence presented, the jury could have rejected the exhibits LMG cites as incredible and instead inferred (based upon the other evidence presented) LMG's profitability during the post-January 2009 period." LMG appealed. In a twenty-page decision, the United States Court of Appeals for the First Circuit, on September 21, 2012, affirmed. *See* <u>Loan Modification Group, Inc. v. Reed</u>, 694 F.3d 145 (1st Cir. 2012). In its decision, the First Circuit observed that "[f]ollowing Reed's expulsion, LMG continued to operate the loan modification business and retained all the profits." The Court of Appeals also repeated the judge's jury instruction as to damages:

> As to damages, the court stated that if the jury found the existence of an enforceable partnership and that a partner had breached the duties of that partnership, it could award Reed "her share of the profits . . . of the partnership from the date of the dissolution of the partnership until the date of the termination of the partnership or, if . . . no such termination occurred, than [sic] the present." J.A. 62.

694 F.3d at 149. The Court of Appeals also determined:

> Dissolution occurs, among other things, "[b]y the expulsion of any partner from the business," as happened here when Reed was excluded from LMG. <u>Id.</u> § 31(1)(d). Under Massachusetts law, upon dissolution of an at-will partnership, each partner "has the right to wind up the partnership affairs." <u>Id.</u> § 37. "On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." <u>Id.</u> § 30. "Winding up" is "the process that occurs during the period following dissolution and preceding termination, during the course of which work in process is completed, partnership assets are sold, creditors are paid, and the business of the partnership is brought to an orderly close." <u>Anastos v. Sable</u>, 819

12

N.E.2d 587, 592 (Mass. 2004) (quoting <u>Adams v. United States</u>, 218 F.3d 383, 388 (5th Cir. 2000)). Each partner's right to "wind up" includes "the right to an account of his interest" in the partnership, Mass. Gen. Laws ch. 108A, § 43, and the right to receive the payment of "the net amount due him from the partnership," <u>id.</u> § 38.

694 F.3d at 151. The First Circuit further observed that "[u]nder Mass. Gen. Laws ch. 108A, § 23(2), '[a] continuation of the business by the partners . . . without any settlement or liquidation of the partnership affairs, is prima facie evidence of a continuation of the partnership.'" <u>Id.</u> at 152 (citations omitted). It concluded:

> [T]he jury could have easily concluded that LMG utilized Reed's client database to operate its business, and that by continuing the business with the assets (customer base) that Reed contributed, LMG breached its duties and obligations to Reed. Where the partnership breaches its fiduciary duty by continuing the partnership business with partnership assets, but depriving the expelled partner of participation in the business, the expelled partner is entitled to "the net amount due him," Mass. Gen. Laws ch. 108A, § 38, from the continuing partnership.

<u>Id.</u> at 153. Despite the First's Circuit's findings, Zak testified at trial in this adversary as follows: "I did not know that I had these obligations as a partner in terms of winding down the partnership. Perhaps I didn't recollect, but I did not know specific requirements of winding down a partnership and, like I said, in my view we weren't partners so it didn't apply anyway."

Prior to the opinion and mandate of the United States Court of Appeals for the First Circuit, Reed in early 2012 commenced an action against Zak, individually, and ZLO in the Middlesex Superior Court Department of the Massachusetts Trial Court. She alleged that "LMG continued operation of the home loan modification business through ZLO by transferring all of LMG's customers, income and assets to ZLO." In addition, she

13

asserted that beginning in January 2010, "a portion of the income and assets of LMG was transferred by LMG to ZAK [sic]."  Reed also alleged that Zak, as LMG's sole officer and director, authorized LMG to transfer the customers, income and assets of LMG to himself and ZLO with the intent and design "to thwart and frustrate the plaintiff's attempts to effectuate and satisfy her legal rights as a partner of LMG under Massachusetts law."  In count III of her three-count complaint, Reed alleged that Zak and ZLO were involved in the conveyance by LMG of its customers, income, and assets to Zak and ZLO and the conveyances were intended to "hide, delay and defraud the plaintiff" in violation of Mass Gen. Laws ch. 109A.[8]  The Middlesex Superior Court action was and is stayed as a result of the the commencement of the Debtor's bankruptcy case and no judgment has entered.

Even before Reed filed her counterclaim against LMG and ZLO in the United States District Court for the District of Massachusetts and filed her complaint against ZLO and Zak in the Middlesex Superior Court, the Attorney General of Massachusetts and the Attorney General of Rhode Island were receiving complaints from clients of LMG and ZLO.  Reed testified that Zak did not discuss with her the illegality of the upfront fees or the complaints being made by the Attorneys General, but she was aware that some homeowners were filing complaints and had filed "lawsuits with the Better Business Bureau saying that they didn't get what they paid for."  She stated "[t]here were problems from the get-go, from the beginning.  That's why we hired Jonathan Friedmann to help

---

[8] Reed did not reference a specific section of ch. 109A.

us get through those issues and that's why the fee agreements changed throughout the

year based off of the advice from our attorney."

Zak testified that LMG ceased to operate in March of 2010 but the business

continued through 2011.  His description of how LMG and ZLO operated in 2009 did not

differ materially from Reed's description.[9]  When Reed became a partner, he conceded

that monies in the accounts belonging to LMG and ZLO were combined and that after

deductions for business expenses and a reserve, profits were divided equally.  Moreover,

the Profit and Loss Statement for ZLO for the period from January to December 2009

showed total income of $1,163,456.11 and total income for the period from January to

March 2010 of $246,287.72.  For those same periods, net income was $130,883.90 and

---

[9] He testified as follows:

> Well, beginning, let's say, in February of 2009 when I incorporated Loan
> Modification Group, the client would come in. They would sign a fee
> agreement -- well, and the fee  agreement changed over the time, but the
> fee agreement initially was with Loan Modification Group and with Zak
> Law Offices available to them to retain as well contemporaneously with
> Loan Modification Group. And basically what would happen is the
> homeowner would pay an advanced fee to Loan Modification Group of
> $2500. They would receive the analytic services of Loan Modification
> Group. They would receive a series of reports and then the client had the
> option of bringing those to Zak Law Offices or hiring Zak Law Offices to
> advocate for them utilizing those reports. Zak Law Offices would draft a
> Chapter 93 demand letter, make contact with the bank or bank's counsel
> and then if the bank -- and then seek to modify the loan using the regulatory
> infractions found in the mortgage documents. If the bank declined to
> modify the loan, then Zak Law Offices would coordinate the filing of a civil
> complaint in court and seek a preliminary injunction to enjoin the
> foreclosure sale.

($49,173.24), respectively.  For the year 2010, ZLO reported income of $1,596,777 and net

income of $72,884.  For LMG, total income for 2009 was $1,047,539.04 with net income of

$207,717.38; for the three month period beginning January 2010, total income was

$175,830 with net income of $7,258.66.

As noted above, LMG's business gradually was routed to ZLO beginning in

January of 2010.  Zak explained the reasons for his decision to terminate Reed and close

LMG.

> There were several events that began to occur in October of 2009, which led
> to my decision to terminate her. The first one was I was -- it was told to me
> by employees of ZLO in Needham, Massachusetts that she had instructed
> employees to copy and paste signatures onto IRS tax forms for the loan
> modification applications. I put her on probation.

In addition, Zak testified that in December of 2009 he learned that Reed was likely to be

indicted.  He decided to close the business, although he continued to collect fees from

clients.

Zak was cognizant of the investigations by Attorneys General in Massachusetts

and Rhode Island.  He testified that the impetus to shutdown LMG was the filing of

complaints by former clients.  He stated:

> I contacted the [Massachusetts] Attorney General's Office and I explained
> to them exactly what I told the Rhode Island Attorney General, that I was
> an attorney, and that I believed that because Loan Modification Group was
> solely owned by an attorney that it could charge advanced fees just like a
> bona fide law firm could. And after I got off the phone I consulted with
> counsel. I looked at the Attorney General Regulation 940 CMR 25, which
> governs the charging of advanced fees for foreclosure-related services, and
> I concluded that at this  point because I had two separate complaints from
> two separate Rhode Island -- from two separate state's Attorney General
> that the sound business decision was to shut down Loan Modification
> Group, that the amount of exposure that Loan Modification Group  had at

this point in terms of fines and penalties and that I also owed a fiduciary duty to LMG as its sole officer to make sure that I came into compliance with the law. And if two Attorney Generals are telling me that I'm breaking the law, I have to comply with the law.

Although Zak made the business decision to cease operating LMG, as noted above, he nevertheless continued to collect fees from its clients.  He testified:

> The reason I continued collecting fees for LMG between January [2010] and March of 2010 was because at the time that I made the decision to shut down Loan Modification Group at the end of December of 2009 there were tens of thousands of dollars of transactions coming in and out of the account. There were numerous letterheads and taped audio commercials and there were numerous employees who were getting automatic paychecks from the accounts. If I were to abruptly shut down the company, employees would not get their paychecks and leave. Potentially hundreds of homeowners would be disenfranchised because they were non-English speaking and they needed the employees to translate documents and to convey updated document requests and they were all -- many of whom were in a constant state of foreclosure.

Zak admitted that he was concerned about fee splitting arrangements with non-lawyers and the receipt of advanced fees. He testified: "I contacted counsel specializing in lawyer's ethics and I was directed to Model Rule 5.4(a)(3) which specifically allows a lawyer to pay a non-lawyer employee a -- profits from a law firm. That is a safe harbor provision . . ." He also testified that without upfront payments from clients, LMG could not operate as it lacked capital to pay its employees and other expenses.  Zak testified that LMG had two or three salaried employees receiving W-2 paychecks.  ZLO had five-six employees.  LMG and ZLO had separate bank accounts.  Zak was unaware of whether they had separate books and records, stating: "I don't know whether they were kept in separate books because I didn't do the books, but they had separate – within QuickBooks they had a separate profit and loss I -- I believe based on the evidence I've seen."

Patrick Dolan ("Dolan"), an attorney with the law firm of Cornell Dolan, testified

without objection as an expert witness about Zak's decision to close LMG.  In his view,

the business judgment rule applied[10] and justified Zak's decision to close LMG.  Dolan

indicated that the decision was a reasonable one based upon a recitation of assumed facts

which track those reproduced above.  Based upon his assumptions, Dolan concluded:

> I think based on the assumptions I made, which were that prior to making
> the decision to shut the business down, the funds from LMG were
> deposited into ZLO, that once the decision to close LMG was made and the
> wind-down took place over a three-month period time, continuing that
> process by depositing the money into ZLO strikes me as being a reasonable
> way of continuing that same business for a short period of time.

---

[10] Dolan defined the business judgment rule as follows:

> The business judgement rule is -- in Massachusetts is a common law rule
> that essentially stands for the proposition that when dealing with a
> decision of a business that the court's responsibility is not to try and
> determine whether the business decision was the best, whether there was
> a better decision available. But -- and it's not to substitute its own
> judgment for the judgment of the business in -- I think it was in the year
> 2000, the SJC issued a decision, the Harman decision -- Harman v. Brown,
> which dealt with a policyholder from John Hancock requesting that a
> board bring a lawsuit against other John Hancock employees and
> directors for illegal lobbying. And the board refused to bring that lawsuit
> and the disgruntled policyholder sued the board and the SJC articulated
> three presumptions that relate to the business judgement rule and that are
> to apply in connection with internal business decisions that are made. The
> three presumptions are that the decision was made on an informed basis,
> that the decision was made in good faith, and that the decision was made
> with the honest belief that it was in the best interest of the business and
> that a party suing a business in a situation where the Business Judgment
> Rule is -- is inculcated has to overcome those presumptions before the
> court will step in and attempt to substitute its own judgment.

Zak's legal troubles did not end with closure of LMG.  In February of 2011, the Commonwealth of Massachusetts, by and through the Attorney General, filed a complaint against him, ZLO, LMG and LMGM seeking preliminary and permanent injunctive relief barring their continued unlawful conduct, restitution, penalties, attorney's fees and costs.[11]  In the complaint, the Attorney General referenced emergency regulations issued to address harmful trends relating to foreclosure–related services, citing 940 Mass. Code Regs. § 25.00, *et seq.*[12]  The Attorney General alleged that the defendants engaged in numerous unfair and deceptive acts and practices through radio, television, print, internet, telephone, and face-to-face advertising, which misled

---

[11] Zak filed a Chapter 7 case on January 12, 2015.  Three days later, on January 15, 2015, the Commonwealth of Massachusetts, by and through its Attorney General, filed a Motion for Determination of Inapplicability of Automatic Stay, seeking a determination that "the automatic stay imposed by 11 U.S.C. § 362(a) does not apply to its prosecution of Commonwealth v. David Zak, et al. (Suffolk Superior Court Civil Action No. 11-0624), a consumer protection enforcement action brought under G.L. c. 93A, § 4 against David Zak ("Debtor") and two other Defendants, and currently pending in Massachusetts Superior Court (the "Enforcement Action")"(footnote omitted).  The Commonwealth attached a copy of its Complaint, filed on February 17, 2011 to its motion.

[12] The regulation provides in pertinent part the following

It is an unfair or deceptive act in violation of M.G.L. c. 93A, § 2(a) to solicit, arrange, or accept an advance fee in connection with offering, arranging or providing Foreclosure-related Services; provided, however, that 940 CMR 25.02(2) shall not prohibit a licensed attorney from soliciting, arranging or accepting an advance fee or retainer for legal services in connection with the preparation and filing of a bankruptcy petition, or court proceedings, to avoid a foreclosure. Provided further, however, that a licensed attorney accepting an advance fee or legal retainer must comply with all applicable laws and regulations pertaining to such fees, including the Massachusetts Rules of Professional Conduct, specifically Rules 1.5 and 1.6. . . .

940 Mass. Code Regs. § 2502(2).

homeowners into believing that they could obtain dramatic loan modifications.   In addition, the Attorney General alleged that the defendants falsely promised to provide legal representation and to file suit against lenders, unlawfully solicited advanced fees, provided inadequate services, employed unfair tactics and refused to provide full refunds.  The Suffolk Superior Court granted the motion on January 20, 2015.[13]  On July 14, 2015, it entered a "Final Judgment and Permanent Injunction," enjoining various activities of the defendants, including Zak, and imposed a $2,000 civil penalty for each violation of Mass. Gen. Laws ch. 93A, § 2.  Its order provided:

> a. Defendant LMG shall pay civil penalties of $114,000, for soliciting, accepting, and/or arranging "advance fees" from fifty-seven consumers, in violation of 940 CMR 25.02(2) and G.L. c. 93A, § 2;

> b. Defendant ZLO shall pay civil penalties of $86,000, as follows:

>> i. $16,000 for soliciting, accepting, and/or arranging "advance fees" from eight consumers, in violation of 940 CMR 25.02(2) and G.L. c. 93A, § 2; and

>> ii. $70,000 for publishing and/or causing to be published 35 unfair or deceptive infomercials in violation of 940 CMR 6.04(1), 940 CMR 25.03(c), and G.L. c. 93A, § 2,

> c. Defendant Zak shall pay civil penalties of $200,000, as follows:

>> i. $130,000 for soliciting, accepting, and/or arranging "advance fees" from sixty-five consumers, in violation of 940 CMR 25.02(2) and G.L. c. 93A, § 2; and

---

[13] This Court takes judicial notice of the Final Judgment and Permanent Injunction entered by the Suffolk Superior Court, as well as its 28-page decision accompanying the Final Judgment and Permanent Injunction which contained findings of fact and conclusions of law.  Commonwealth of Mass. v. Zak, No. 2011-00624H, Slip op. (Mass. Super. July 14, 2015).  See Fed. R. Evid. 201(b)(2).

ii. $70,000 for publishing and/or causing to be published 35 unfair or deceptive infomercials in violation of 940 CMR 6.04(1), 940 CMR 25.03(c), and G.L. c. 93A, § 2.

In addition, pursuant to Mass. Gen. Laws ch. 93A, § 4, the Superior Court ordered the defendants to pay to the Commonwealth restitution of $157,000, reflecting advanced fees collected from 65 consumers who filed complaints with the Commonwealth, as well as $68,146 in attorney's fees and costs.

In its 28-page decision accompanying the Final Judgment and Permanent Injunction, the Superior Court found that "Zak was the sole owner, officer, and director of Zak Law Offices, and controlled all of its employees and affairs. He does not dispute that he was ultimately responsible for everything at Zak Law Offices." Commonwealth of Mass. v. Zak, No. 2011-00624H, Slip op. at 4 (Mass. Super. July 14, 2015). In addition, the state court determined that "Zak was the sole owner, officer and director of LMG," adding "Zak conceded that he oversaw LMG's operations, made its ultimate decisions, and had final say over all of its operations." Id. With respect to Reed, the Superior Court determined:

In 2007, Zak met Elizabeth "Lisa" Reed. Reed was a mortgage broker who had placed thousands of sub-prime mortgage loans, many of them for lower-income persons of Hispanic or Portuguese or Brazilian descent. Much later, in 2011, Reed pleaded guilty in federal court in Massachusetts to money laundering and wire fraud in connection with her placement of subprime mortgage loans, for which she served 14 months in federal prison.

Well before this, in late 2008, Reed and Zak joined forces to offer loan modification services to homeowners facing foreclosure. Reed brought to the enterprise her list of thousands of borrowers for whom she had placed subprime mortgage loans; she and Zak correctly surmised that many of those borrowers might now be unable to make their mortgage payments. Reed also brought along with her some of the agents who had worked for

her in her mortgage placement business, many of them Spanish speakers. Zak brought to the enterprise its initial funding, as well as his willingness to market himself as a lawyer who could save such borrowers from foreclosure by obtaining modifications of their mortgage loans. However, at this point Zak had never performed any loan modification, bankruptcy, or foreclosure avoidance services; had never sued a bank on behalf of a homeowner; and had never represented a homeowner in connection with a loan modification or other foreclosure-related services.

Zak and Reed agreed to a 50/50 split of the profits they would earn from their planned loan modification business. Zak and Reed could not share profits from loan modification work performed through Zak Law Offices, however, because Reed, who was not an attorney, could not be a partner in that law firm. Nonetheless, Reed moved into the Needham office of Zak Law Offices, and, under the auspices of Zak Law Offices, Zak and Reed began to offer loan modification services to consumers.

A few months later, Reed and Zak agreed to create LMG and make it the vehicle for at least some aspects of their loan modification business. Reed already was facing legal troubles at this point, and so Zak suggested that her name not be associated with LMG. To put in place the 50/50 split of the profits, Zak, acting for LMG, entered into an oral partnership arrangement with Reed. Zak and Reed then set up LMG's office in Revere in February 2009.

About a year later, in January 2010, Zak told Reed that he no longer needed her in the loan modification business, and he had her escorted out of LMG's offices by an armed police officer. Federal court litigation ensued, leading to a trial in which a jury awarded Reed $414,000, a result that was affirmed on appeal by the First Circuit.

Id. at 4-6.[14]  The Superior Court also determined:

Defendant Zak is responsible for all of the violations established by the Commonwealth. First, I conclude that he is personally liable for civil penalties for each of the violations because he personally participated in each of the violations. He drafted and delivered the infomercials, and he directed the two entities he controlled, LMG and Zak Law Offices, to accept the advance fees. The fact that corporate entities actually committed the violations does not relieve Zak of his personal responsibility; "It is settled that corporate officers may be held personally liable under c. 93A for their

---

[14] *See also* www.mass.gov/ago/docs/press/2015/zak-final-judgment.pdf.

personal participation in conduct invoking its sanctions." <u>Cmty. Builders,
Inc. v. Indian Motorcycle Assocs., Inc.</u>, 44 Mass. App. Ct. 537, 560 (1998).
Second, Zak is also liable for the violations committed by LMG and Zak
Law Offices as a corporate officer who "operated or controlled the
corporation" and "had knowledge of [the] unlawful acts." <u>Nader v. Citron</u>,
372 Mass. 96, 103 (1977), *abrogated on other grounds*, <u>Iannacchino v. Ford
Motor Co.</u>, 451 Mass. 623 (2008). Therefore, I assess a civil penalty of
$200,000 against Zak.

In addition to the suit commenced against him by the Attorney General of the

Commonwealth of Massachusetts, Zak was the subject of a petition for discipline filed in

April of 2013 by the Office of Bar Counsel of the Massachusetts Board of Bar Overseers.

It recommended his disbarment from the practice of law in the Commonwealth, having

adopted the findings of a special hearing officer who conducted an evidentiary hearing

over 12 days at which 25 witnesses testified and over 220 exhibits were introduced into

evidence.  Zak, while not contesting the actions asserted in the petition, challenged the

sanction, maintaining his conduct would at most warrant suspension.  Associate Justice

Barbara Lenk of the Supreme Judicial Court concluded that disbarment was the

appropriate sanction, stating "[n]othing less would be adequate both to protect the public

from harm and to prevent further damage to the public's view of the integrity of the legal

profession than already has resulted from the respondent's misconduct."   She

determined:

> Until June 2009, he [Zak] continued to pay Reed for each client she obtained, as
> well as for each "agent" she brought in to work for LMG; thereafter, *the respondent
> [Zak] and Reed entered into an agreement to share equally in the combined net profits of
> LMG and ZLO derived from the loan modification clients.*

<u>In re David Zak</u>, No. BD-2015-080, Slip op. at 5 (S.J.C. March 16, 2016) (Exhibit 32).

Although at the time of the trial in this adversary proceeding, Zak's appeal was

pending, the Supreme Judicial Court affirmed the order of disbarment in <u>In re Matter of</u>

<u>Zak</u>, 476 Mass. 1034, 73 N.E.3d 262 (2017). The Supreme Judicial Court, quoting Associate

Justice Lenk, observed and ruled:

> The respondent does not dispute that he engaged in the conduct described in the hearing officer's findings, which were adopted by the board. We have thoroughly reviewed the record, and agree with the single justice that these findings were supported by substantial evidence. There is no need to repeat the single justice's detailed discussion here. Quoting the board, the single justice observed that the respondent:
>
> > "systematically extracted illegal and excessive fees from numerous vulnerable and desperate clients with deceptive advertisements, misleading contractual arrangements, and deceptive and useless services such as the 'lender benefit analysis' and the 'forensic loan audit.' In addition, *he engaged in unlawful fee-splitting to provide his partner* and his employees with the financial incentive to use the machinations to enhance his personal financial interest at the expense of his clients."

476 Mass. at 1036, 73 N.E.3d at 266 (emphasis supplied). Reed was both complicit in, and

a beneficiary of, Zak's misconduct. Nevertheless, Justice Lenk and the Supreme Judicial

Court, in adopting her decision, determined that Zak used LMG and ZLO as

instrumentalities to perpetrate the business of extracting illegal and exorbitant fees from

vulnerable clients with his partner, Reed, and engaged in fee-splitting with her. Thus,

the Supreme Judicial Court, and the tribunals initially considering Zak's fitness to

practice law, implicitly disregarded the corporate veil of LMG by finding as a fact that

Reed and Zak were partners.

## III. DISCUSSION

### A. <u>Introduction</u>

As noted above, the Plaintiff's Amended Complaint was poorly pled.  Indeed, the Plaintiff, while necessarily seeking to hold Zak personally liable for partnership profits owing to references to, and reliance on, § 523(a)(2)(A), (a)(4), and (a)(6), confused theories of liability and failed to ably articulate theories of relief; indeed Reed's attorney expressly stated that she did not contend that the Defendant was liable to her as a partner, a position she implausibly maintained after trial despite overwhelming evidence to the contrary and the ruling of the Supreme Judicial Court.  The Defendant asserted that the Plaintiff failed to establish the existence of a debt owed by him personally to the Plaintiff, emphasizing that he had "no reason to know in 2010 that later events would play out this way in 2011."

Despite the positions advanced by the parties in their pleadings, the evidence presented at trial tells the real a story about their relationship, although different from the ones they posit.  Indeed, the parties' respective positions are inconsistent with the evidence adduced at trial, and the overwhelming evidence that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," specifically the Superior Court action commenced by the Attorney General against Zak and the decision issued in that case, as well as the decision of the Supreme Judicial Court affirming Zak's disbarment.  This Court can take judicial notice of those decisions as their accuracy cannot reasonably be questioned.  *See* <u>Wilson v. Bodnar</u>, 750

F. Supp.2d 186, 188 n.1 (D. Me. 2010)(citing <u>United States v. Bello</u>, 194 F.3d 18, 23 (1st Cir.1999)).[15]

Federal Rule of Civ. P. 15(b)(2), made applicable to this proceeding by Fed. R. Bankr. P. 7015, provides in pertinent part:

> (b) **Amendments During and After Trial**.
>
>> (2) **For Issues Tried by Consent**. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2). The parties expressly and/or impliedly consented to the trial of issues not raised by the Plaintiff in her Amended Complaint, or even recognized by her in her post-trial brief.  By necessity, the Plaintiff had the burden of establishing the existence of a debt owed to her by Reed.  Seemingly constrained by the judgment she obtained against LMG in the United States District Court for the District of Massachusetts, Reed failed to develop what appears plain to this Court, as well as to the Supreme Judicial Court, namely that Reed and Zak were partners and that Zak cannot use the corporate form to shield himself from liability for his personal torts.  *See* <u>LaClair v. Silberline Mfg. Co. Inc.</u>, 379 Mass. 21, 29, 393 N.E.2d 867, 872 (1979) ("A corporate officer is liable for torts in which he personally participated whether or not he was acting within the scope of his authority").  *See also* <u>Falcone v. Ragonese (In re Ragonese)</u>, No.

---

[15] The Court notes that Zak referenced the decision of the Superior Court in <u>Commonwealth v. Zak</u>, No. 11-0624-H, in his post trial brief.

11-42867-MSH, 2013 WL 3379537, at *4 (Bankr. D. Mass. July 8, 2013), *aff'd*, 505 B.R. 605

(B.A.P. 1st Cir. 2014) (citing, *inter alia*, <u>Marshall v. Stratus Pharmaceuticals, Inc.</u>, 51 Mass.

App. Ct. 667, 677, 749 N.E.2d 698, 708 (2001);  <u>Standard Register Co. v. Bolton–Emerson,</u>

<u>Inc.</u>, 38 Mass. App. Ct. 545, 550–551, 649 N.E.2d 791 (1995); <u>The Community Builders, Inc.</u>

<u>v. Indian Motocycle Assocs., Inc.</u>, 44 Mass. App. Ct. 537, 560, 692 N.E.2d 964 (1998)).

In <u>In re Ragonese</u>, *supra,* a case involving a dispute arising out of the construction

of a lakeside vacation home, the defendant, the principal of the corporation engaged to

build the home, did not oppose the plaintiff's recasting of a veil-piercing cause of action

to one for fraudulent inducement and the prosecution of that claim at trial.  The court

determined that Rule 15(b)(2) permitted it to treat the fraudulent inducement claim in all

respects as if it had been raised in the pleadings and, accordingly, determined the merits

of the claim.  2013 WL 3379537, at *4.  This Court adopts that approach here, particularly

as it is compatible with "[t]he goal of Rule 15(b) [which] is to promote the objective of

deciding cases on the merits rather than on the relative pleading skills of counsel." <u>Am.</u>

<u>Family Mut. Ins. Co. v. Hollander</u>, 705 F.3d 339, 348 (8th Cir. 2013) (citing <u>Foman v. Davis</u>,

371 U.S. 178, 181–82, 83 S. Ct. 227 (1962)). "Thus, amendments under the rule are to be

'liberally granted where necessary to bring about the furtherance of justice and where the

adverse party will not be prejudiced.'" <u>Id.</u> (quoting <u>Am. Fed'n of State, Cty. & Mun.</u>

<u>Emps. v. City of Benton</u>, 513 F.3d 874, 883 (8th Cir. 2008) (internal quotation marks and

citation omitted)).  *See also* <u>Noonan v. Rauh (In re Rauh)</u>, 119 F.3d 46, 52 (1st Cir. 1997).

("Under Rule 7015(b), motions to amend a complaint to conform to the evidence admitted

at trial are liberally allowed.").

The Court finds that Zak consented to the introduction of evidence pertinent to his personal liability for a debt owed to Reed.  Zak agreed to the introduction into evidence of exhibits, including memoranda memorializing the sharing of profits by Reed and Zak and the decision of Justice Lenk, later affirmed by that Supreme Judicial Court, in Zak's disbarment action.  Those exhibits as well as Reed's testimony established a partnership between Reed and Zak.  Zak cannot complain if evidence to which he did not object undermines his defense and establishes the existence of a debt even if Plaintiff's counsel did not appreciate his burden of demonstrating Zak's individual liability.  The claims for relief Reed set forth in her Amended Complaint depend upon the existence of a personal obligation on the part of Zak to her.  Regardless of how the parties framed the issues, a determination of Zak's personal liability to Reed is at the heart of this adversary proceeding.  Any evidence pertinent to such a determination, whether in the form of testimony, exhibits, or judicial notice of decisions whose accuracy cannot reasonably be questioned is pertinent to that determination.  This Court concludes there was substantial evidence to establish Zak's personal liability to Reed and that the issue of Zak's personal liability was tried with his implied consent.

> Implied consent exists where a party has "actual notice of an unpleaded issue and ha[s] been given an adequate opportunity to cure any surprise resulting from the change in the pleadings." Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir.1997) (internal quotation marks and citation omitted). Thus, "[c]onsent may be implied when evidence relevant to an unpleaded issue has been introduced at trial without objection." Modern Leasing, Inc. of Iowa v. Falcon Mfg. of Cal. Inc., 888 F.2d 59, 63 (8th Cir. 1989) (internal quotation marks and citation omitted). Further, we have held a party will be deemed to have acquiesced in trying an unpleaded issue when the issue is "not inconsistent with" the position taken by the

non-moving party earlier in the proceedings. Baker, 382 F.3d at 831; *see also* IES Indus. Inc. v. United States, 349 F.3d 574, 579 (8th Cir. 2003).

Am. Family Mut. Ins. Co. v. Hollander, 705 F.3d 339, 348 (8th Cir. 2013).   This Court recently observed:

> A party can give implied consent to the litigation of an unpleaded claim in two ways: by treating a claim introduced outside the complaint 'as having been pleaded, either through [the party's] effective engagement of the claim or through his silent acquiescence'; or by acquiescing during trial 'in the introduction of evidence which is relevant only to that issue.'" Antilles Cement Corp. v. Fortuno, 670 F.3d at 319 (alteration in original) (quoting Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1172 (1st Cir. 1995)). As a general rule, implied consent can be found when a party fails to object to evidence relating to issues that are beyond the pleadings, but this finding depends on the circumstances of each case, Haught v. Maceluch, 681 F.2d 291, 305 (5th Cir. 1982), and "[t]he introduction of evidence relevant to an issue already in the case may not be used to show consent to trial of a new issue absent a clear indication that the party who introduced the evidence was attempting to raise a new issue." Id. (quoting Int'l Harvester Credit Corp. v. East Coast Truck, 547 F.2d 888, 890 (5th Cir. 1977)).

The Patriot Group, LLC v. Fustolo (In re Fustolo), 563 B.R. 85, 105 (Bankr. D. Mass. 2017).

*See also* Premier Capital, LLC v. Crawford (In re Crawford), 841 F.3d 1 (1st Cir. 2016).

Implied consent and the amendments to conform to the evidence is not permitted unless "a party 'had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory.'" In re Rauh, 119 F.3d at 52 (citing, *inter alia*, Browning Debenture Holders' Comm. v. DASA Corp., 560 F.2d 1078, 1086 (2d Cir.1977)).

The evidence of Zak's personal liability to Reed and of the existence of a de facto partnership between Reed and Zak as will be discussed more fully below, was substantial and cannot be ignored despite the jury verdict in the federal district court action in which

Zak was neither a plaintiff nor a counterclaim defendant.  While Zak has never conceded his personal liability to Reed, he did not object to the introduction of substantial evidence that established a de facto partnership, in particular memos establishing that he and Reed equally shared the profits of the loan modification business, as well as evidence from his disbarment proceedings.  In other words, Reed did not share profits with LMG or ZLO - - she and Zak shared profits of their loan modification business, regardless of which entity, LMG or ZLO, extracted fees from vulnerable clients. In short, LMG was established to camouflage Reed's involvement in the business, although Zak acted like and was found to be acting like a managing partner with control over bank accounts. Moreover, sufficient evidence was presented to warrant piercing the corporate veil of LMG to hold Zak personally liable for his own tortious conduct.  Zak had a full and fair opportunity to submit contrary evidence, but chose to principally rely on the judgment against LMG Reed obtained in the federal district court action where he was not named by Reed as a defendant in her counterclaim.

This Court's obligation is to apply the law to the facts as proven.  Zak's personal liability for any debt for Reed's share of the profits of the loan modification business was clear based upon overwhelming evidence.

B. 11 U.S.C. § 523(a)(4)

1. Applicable Law

In her Amended Complaint, Reed seeks to except a debt from discharge under 11 U.S.C. § 523(a)(2)(A), (4), and (6).  Section 523 provides in relevant part the following:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-- . . .

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

>> (A) false pretenses, a false representation, or actual fraud, other than statement respecting the debtor's or an insider's financial condition; . . .

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . .

11 U.S.C. § 523(a)(2)(A), (4), and (6).  In order to prevail under any of those sections, Reed had the burden of proving, first, that Zak, individually, owed her a debt, *see* <u>Chen v. Huang (In re Huang)</u>, 509 B.R. 742, 754 (Bankr. D. Mass. 2014)("in the context of the dischargeability proceeding, the bankruptcy court is not only tasked with determining whether the circumstances for nondischargeability enumerated in § 523(a) are established, but must also necessarily determine the scope of the debtor's "liability on [the] claim' and the creditor's 'right to payment.'").  Once she established the existence of a debt, then Reed had the burden of proving each element of a claim under § 523(a)(2)(A), (4), or (a)(6), by a preponderance of the evidence. <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 787 (1st Cir. 1997)(citing <u>Grogan v. Garner</u>, 498 U.S. 279, 287 (1991)).

"The issue of whether a party is 'acting in a fiduciary capacity' within the meaning of § 523(a)(4) is one of federal law." <u>Zacharakis v. Melo (In re Melo)</u>, 558 B.R. 521, 556 (Bankr. D. Mass. 2016) (citing <u>Petrucelli v. D'Abrosca (In re D'Abrosca)</u>, No. 10–062, 2011

31

WL 4592338, at *5 (B.A.P. 1st Cir. Aug. 10, 2011)). "'In order to be acting as a fiduciary, a

party must be acting pursuant to an express or technical trust, not a trust which the law

implies from a contract.'" In re Melo, 558 B.R. at 556 (quoting Breed's Hill Ins. Agency v.

Fravel (In re Fravel), 485 B.R. 1, 14 (Bankr. D. Mass. 2013), and citing Davis v. Aetna

Acceptance Co., 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934)).   An express trust

requires "'an explicit declaration of trust, a clearly defined trust res, and an intent to

create a trust relationship.'" Melo, 558 at 556 (citing, *inter alia*, Raso v. Fahey (In re Fahey),

482 B.R. 678, 687 (B.A.P. 1st Cir. 2012)).

    With respect to partners,

    Under Massachusetts law, in order to create an express trust there must be
    an intent to create a trust, a specific trust res, and identifiable beneficiaries.
    Ventura v. Ventura, 555 N.E.2d 872, 407 Mass. 724, 727–28 (1990).

    Massachusetts courts have universally recognized the fiduciary
    relationship of partners and impose on them obligations of good faith and
    integrity in their dealings with one another in partnership affairs. Wilkes v.
    Springside Nursing Home, Inc., 370 Mass. 842, 353 N.E.2d 657 (1976);
    Cardullo v. Landau, 329 Mass. 5, 105 N.E.2d 843 (1952); Nelson v. Bailey,
    303 Mass. 522, 22 N.E.2d 116 (1939). It is a fundamental characteristic of
    partnership that the partners' relationship is one of trust and confidence.
    One partner cannot, directly or indirectly, use partnership assets for his
    own benefit; he or she cannot, in conducting the business of the partnership,
    take any profit clandestinely, the partner cannot carry on the business of
    the partnership for private advantage; nor can he or she avail himself or
    herself of knowledge or information which may be regarded as property of
    the partnership. Latta v. Kilbourn, 150 U.S. 524, 541, 14 S.Ct. 201, 207–08, 37
    L.Ed. 1169 (1893).

    The Supreme Court as well as Massachusetts common law clearly evince
    an intent that partners act as trustees for the benefit of each other with
    respect to the trust res which consists of the partnership assets. A
    partnership is an association. Mass. Gen. L. ch. 108A § 6(1). It is created by
    a voluntary contract. Boyer v. Bowles, 310 Mass. 134, 37 N.E.2d 489 (1941).
    The Court finds that Massachusetts partnerships satisfy the necessary

elements of an express trust and and that partners act in a fiduciary capacity toward each other for purposes of § 523(a)(4).

Bane v. LeRoux (In re Curran), 157 B.R. 500, 509–10 (Bankr. D. Mass. 1993). *See, e.g.*, Pierce v. Stevens (In re Stevens), No. 12-32221, 2014 WL 6686497, at *5 (Bankr. N.D.N.Y. Nov. 25, 2014) ("this Circuit has held that the fiduciary requirement of § 523(a)(4) can still be met if state common law has elevated the duties of partners beyond the statute so as to create an express or technical trust . . . This is the case in New York since the courts have held that 'New York partners are at all times accountable to one another as trustees.'").

With respect to defalcation, the Supreme Court, in Bullock v. BankChampaign, N.A., __ U.S. __, 133 S.Ct. 1754, 1759–60 (2013), determined the following:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). *See* id., § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include "'wilful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Id., § 2.02(2)(c), at 226 (emphasis added). *Cf.* Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").

Bullock v. BankChampaign, N.A., __ U.S. __, 133 S.Ct. 1754, 1759–60 (2013).

2. Analysis

Reed indirectly asserts that Zak owed her a debt that arose from "fraud or defalcation while he was acting in a fiduciary capacity." Although arguing that Zak owed a fiduciary duty to LMG, she implicitly argues that she and Zak were partners *in* LMG, rather than the jury's conclusion in the federal district court action in which Zak was not a party, namely that she was a partner *with* LMG. *See* 11 U.S.C. § 523(a)(4). Reed alleges that Zak owed a fiduciary duty to LMG and breached his fiduciary duty to LMG. The evidence presented, however, established more than that: Reed and Zak were, in fact, partners in the loan modification business.

As the Superior Court determined, Reed, who was a mortgage broker, "had placed thousands of sub-prime mortgage loans" and she "brought to the enterprise her list of thousands of borrowers for whom she had placed sub-prime loans." In addition, she brought along with her some of the agents who had worked for her in her mortgage placement business, many of them Spanish speakers." Commonwealth of Mass. v. Zak, Slip op. at 5. Without Reed, there was no loan modification business as Zak had never been involved in any loan modifications, bankruptcy cases or provided any foreclosure avoidance services. Id. Zak's testimony that Reed was merely an employee is unbelievable and the Court completely discredits it. His testimony is contrary to the overwhelming evidence, in particular the decision of the Supreme Judicial Court which determined that he engaged in illegal fee-splitting "with his partner." Matter of Zak, 476 Mass. at 1036, 73 N.E.3d at 266. That decision was the culmination of of a process that

34

began when a special hearing officer conducted an evidentiary hearing over twelve days at which 25 witnesses testified and 220 exhibits were introduced into evidence.

This Court concludes that Zak's disclaimer of knowledge of the rudiments of partnership law was specious, incredible, and immaterial to the objective manifestations of a partnership between Zak and Reed.  The parties' decision to equally share profits evidences that understanding, as that type of profit sharing is the hallmark of a partnership, not an employer/employee relationship, even if Zak who was primarily responsible for books and records of LMG had had more control over its financial affairs. *See* Kansallis Fin. Ltd. v. Fern, 40 F.3d 476, 478-79 (1st Cir. 1994) ("Intent to carry on business as partners may be inferred from the partners' words and acts."); Fenton v. Bryan, 33 Mass. App. Ct. 688, 691 (1992). Reed's testimony as to her partnership agreement with Zak was straightforward and credible.  Zak's testimony was not.  Zak's decision to abruptly exclude Reed from the business premises, using a plain clothes policeman, evidences his knowledge of wrongdoing.

Zak's lack of any compunctions with respect to the use of his position as an attorney to extract fees from distressed clients of LMG and ZLO compels the conclusion that he similarly would not have had, and did not have, any compunction about scooping all profits of the loan modification business, half of which belonged to Reed, when the loan modification business was "exploding" but Reed's legal position was deteriorating. Zak was well aware of Reed's criminal exposure at the commencement of their relationship; his decision to incorporate LMG and to issue checks to Reed's nominees, Amarilla and American Union Corporation, was due to her legal problems.  Zak's

35

decision to exclude her from their business venture based upon her conduct in copying and pasting client signatures on IRS tax forms for the loan modification process appears to this Court to be a mere pretext for denying her a share of the profits. It enabled him to enrich himself once the business was established and, in Reed's words, "exploding."

Zak's professed ignorance of the law applicable to partnerships, his conscious decision to ignore Reed's letter of January 8, 2010, and his ignorance of, or blatant disregard for, Massachusetts Rules of Professional Conduct, reinforces the Court's conclusion that he converted her partnership profits. This Court has no reason to believe that his "repeated and multiple ethical violations in connection with loan modification and mortgage foreclosure cases" would have been limited to vulnerable clients of LMG and ZLO. Rather, the Court concludes that Zak's lack of ethics extended to Reed who also was vulnerable in view of her pending criminal indictment. Moreover, even if Zak had a business justification for closing LMG, such a justification would not have absolved him of his partnership obligations to his partner Reed. His testimony that she was not his partner was incredible, particularly where Reed supplied the architecture for the business in the form of clients whom she assisted in obtaining sub-prime mortgages, her connections with "agents" who could supply the loan modification business with a steady stream of clients, and her experience as a mortgage broker. Zak had none of this experience; all he had was some capital and a law license which he chose to unethically exploit.

Zak also held a position of ascendency over Reed. Aware of her personal legal problems, he incorporated LMG and LMG's name appeared on bank accounts and tax

returns which he controlled.  Because LMG, on paper and in practice was owned and controlled by Zak, and was the payee of client funds in the loan modification business, Zak held more power than Reed with respect to the collection and disposition of partnership funds.  *See, e.g.*  Hutton v. Vasa (In re Vasa), No. 14-12324-JNF, 2016 WL 890130, at *10 (Bankr. D. Mass. Mar. 8, 2016); Baker v. Friedman (In re Friedman), 298 B.R. 487, 498–99 (Bankr. D. Mass. 2003).

In regard to Reed's burden of proof, this Court recognizes that she obtained a judgment with respect to her counterclaim in the United States District Court for the District of Massachusetts only against LMG, not Zak or ZLO.  Nevertheless, in certain circumstances, the Court (as the Supreme Judicial Court appears to have done) may disregard the corporate form, particularly where a corporation is solely owned and controlled by one individual to perpetrate fraud.  As this Court observed in Butler v. Candlewood Road Partners, LLC (In re Raymond), 529 B.R. 455 (Bankr. D. Mass. 2015),

> In Massachusetts, piercing the corporate veil is a well-recognized, yet fact specific, remedy. *See* Zimmerman v. Puccio, 613 F.3d 60, 74 (1st Cir. 2010); My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620, 233 N.E.2d 748 (1968). In addition, Massachusetts courts hold that "the corporate veil will only be pierced in rare situations." Birbara v. Locke, 99 F.3d 1233, 1239 (1st Cir. 1996). . . .

In re Raymond, 529 B.R. at 475 (footnotes omitted).  Similarly, the United States Court of Appeals for the First Circuit in Morely v. Ontos, Inc. (In re Ontos, Inc.), 478 F.3d 427 (1st Cir. 2007), *cert. denied,* 552 U.S. 823 (2007), stated:

> *Under Massachusetts law, a claim may be brought against the "alter ego" of a corporation when "there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the*

*intercorporate relationship*" or when "there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 752 (1968). In such circumstances, courts may allow a plaintiff to pierce the corporate veil of limited liability in order to "provide a meaningful remedy for injuries and to avoid injustice." Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 736 N.E.2d 373, 380 (2000). Likewise, a claim may be brought against a successor corporation where "it either assumes [the obligation] under express agreement or where the facts and circumstances are such as to show an assumption." Aldrich v. ADD Inc., 437 Mass. 213, 770 N.E.2d 447, 452 (2002) (quoting Araserv, Inc. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc., 437 F.Supp. 1083, 1089 (D. Mass. 1977)).

In re Ontos, 478 F.3d at 432 (emphasis supplied). Thus, piercing the corporate veil is not limited to those circumstances where there is a confused intermingling of activities of corporate entities, but can be employed to thwart the perpetration of fraudulent or other reprehensible conduct by an alter ego or to hold corporate officers responsible for their personal torts. In bankruptcy cases, courts in other jurisdictions have referenced similar standards. For example, under New York law, a party may pierce the corporate veil if they can demonstrate that "'(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury[.]'" Ng. v. Adler (In re Adler), 467 B.R. 279, 286 (Bankr. E.D.N.Y. 2012), *appeal denied, judgment aff'd sub nom.* Ng v. Adler, 518 B.R. 228 (E.D.N.Y. 2014) (citations omitted). In other words, "'[t]he party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court of equity will

38

intervene.'" Id. (citations omitted). *See, e.g.,* Terry v. Meredith (In re Meredith), 467 B.R.

279, 380 (Bankr. E.D. Va. 2006), *aff'd sub nom.* In re Stephen S. Meredith, CPA, P.C., 367

B.R. 558 (E.D. Va. 2007), *aff'd sub nom.* In re Meredith, 527 F.3d 372 (4th Cir. 2008) (under

Virginia law, "a party 'seek[ing] to disregard' the corporate entity must show that the

shareholder sought to be held personally liable has controlled or used the corporation to

evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to

gain an unfair advantage.'").

Reed did not introduce any evidence that LMG and ZLO failed to observe

corporate formalities or that there was a *confused* intermingling of activity between the

two corporations and Zak. She did, however, submit evidence that LMG through and by

Zak transferred monies to ZLO, and ZLO through Zak distributed partnership profits to

her and Zak equally. Although both LMG and ZLO engaged in the same activities, they

had separate bank accounts, filed separate tax returns, and had different employees and

at least for a period of time operated out of different locations. Nevertheless, as discussed

above, there was overwhelming evidence that Zak was the alter ego of LMG and Reed's

partner in the loan modification business. Indeed, Reed testified that she and Zak made

"decisions together, like we normally did," and that Zak suggested that she "get paid the

50 percent of the business at that time because I was equal partner [sic]."

This Court infers from the weight of the evidence that Zak incorporated LMG

solely to conceal Reed's involvement in the loan modification business which they were

embarking on and it was his alter ego. Zak and Reed as partners utilized the corporate

structure to develop and perpetuate that loan modification business. Zak cannot hide

behind the corporate structure of LMG to evade his personal liability for conduct that fits squarely within the definition of defalcation set forth in <u>Bullock.</u> Zak's conduct as a partner, and as an attorney involved "'a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" <u>Bullock</u>, 133 S.Ct. at 1760. This Court has no difficulty concluding that Zak breached his duty under partnership law to segregate profits for Reed - - profits which he held in trust for her under partnership law.  Indeed, Reed, through her January 8, 2010 letter, advised Zak personally of his responsibilities under partnership law to segregate monies and to account to her for partnership profits.  Most importantly, although he was required as a partner to hold profits in trust for her from the inception of their partnership agreement, she advised him "to hold in trust all profits derived from the affair of the partnership. . . ." He did not do so.  In other words, Zak's conduct falls squarely within the contours of § 523(a)(4).  There was a trust, and Zak breached his fiduciary duty to his partner Reed by failing to account and by usurping her share of the profits of their partnership.

Reed established in the district court action that LMG owed her $18,000 per month for her share of partnership profits or $324,000.  Because this Court concludes that Zak was the alter ego of LMG and responsible for his own torts and that LMG was a mere instrumentality of a de facto partnership between Zak and Reed, the Court concludes he is personally liable to Reed for that amount and that amount is nondischargeable pursuant to § 523(a)(4).

Zak argues that Reed cannot hold him personally liable for that obligation because she did not sue him personally in her counterclaim in the federal district court.  This

40

Court rejects that argument.  Although Reed could have sued Zak in that action, her

claims in this adversary proceeding only arise under the Bankruptcy Code.  Her claims

against Zak personally under 11 U.S.C. § 523(a) are not barred because she did not name

Zak as a defendant in her counterclaim in the United States District Court action.  She

could not have sought such a determination in that action as Zak was not a debtor at the

time.

    C. § 523(a)(6)

       1. Applicable Law

"To prevail on a complaint to except a debt from discharge, as one caused by a

debtor's 'willful and malicious injury,' a creditor must prove that (1) the debtor caused

him or her injury; (2) the debtor's actions were malicious; and (3) the debtor's actions

were willful." Jones v. Svreck (In re Jones), 300 B.R. 133, 139 (B.A.P. 1st Cir. 2003).  In In

re Jones, the court, citing Kawaauhau v. Geiger, 523 U.S. 57, 57, (1998), and Printy v. Dean

Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir.1997), summarized the law applicable to

§ 523(a)6) as follows:

> In Kawaauhau v. Geiger, the Supreme Court found that the exception to
> discharge set forth in § 523(a)(6) for a willful and malicious injury includes
> "only acts done with the actual intent to cause injury." 523 U.S. 57, 57, 118
> S.Ct. 974, 140 L.Ed.2d 90 (1998). "[D]ebts arising from recklessly or
> negligently inflicted injuries do not fall within the compass of § 523(a)(6)."
> Id. at 64, 118 S.Ct. 974. The Supreme Court has established that the word
> "willful" requires intent to injure and not merely intent to perform the act
> that causes injury. See id. at 61, 118 S.Ct. 974.
>
> The word "malicious" requires that the injury be "wrongful" and
> committed "without just cause or excuse, in conscious disregard of one's
> duty." Printy, 110 F.3d at 859 (1st Cir.1997). "No special malice toward the

creditor need be shown," as malice can be present "even in the absence of personal hatred, spite or ill-will." Id.

In re Jones, 300 B.R. at 140.  As this Court noted in deBenedictis v. Dougherty (In re Dougherty), 509 B.R. 757, 769 (Bankr. D. Mass. 2014), aff'd sub nom. deBenedictis v. Dougherty, No. CV 14-12139-GAO, 2015 WL 4480724 (D. Mass. July 22, 2015),

> In Massachusetts, the tort of conversion "requires the exercise of dominion or control over personal property of another." See Third Nat'l Bank v. Continental Ins. Co., 388 Mass. 240, 244, 446 N.E.2d 380 (Mass. 1983); see also Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993) (discussing the elements of conversion under Massachusetts law); Gen. Elec. Co. Bus. Lighting Group v. Halmar Distributors, Inc. (In re Halmar Distributors, Inc.), 232 B.R. 18, 22 (Bankr. D. Mass. 1999) ("Conversion is the wrongful exercise of dominion or control over the personal property, including money, of another."); Morrin v. Manning, 205 Mass. 205, 211, 91 N.E. 308 (1910) (money may be the subject of conversion).

In re Dougherty, 509 B.R. at 769.  According to the United States Court of Appeals for the First Circuit in Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90 (1st Cir. 1993),

> A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d at 95 (footnote and citations omitted).  In Massachusetts,

> An action for conversion "'cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property.'" Grande v. PFL Life Ins. Co., No. 9663, 2000 WL

1476676, at *4 (Mass. App. Div. Sept.27, 2000) (quoting Spooner v.
Manchester, 133 Mass. 270, 273 (1882)). It is no defense to conversion for
defendant to claim that he acted in good faith, reasonably believing that he
had a legal right to possession of the goods. See Kelly v. Dubrow, No. 1313,
2001 WL 287490, at *3 (Mass. App. Div. Mar.20, 2001).

Hancock v. Caliri (In re Caliri), 335 B.R. 2, 13 (Bankr. D. Mass. 2005) (quoting Kelley v.

LaForce, 288 F.3d 1, 11–12 (1st Cir. 2002)). Moreover, "[c]onversion does not require an

intent to deprive the owner permanently of the property. . . . Rather, one only need intent

to exercise dominion or control over the property of another and can be held liable for

conversion even if the property over which he exercised control was believed to be his

own." John Hancock Fin. Servs., Inc. v. Sloane (In re Sloane), No. 01-1213-JMD, 2002 WL

1000956, at *6 (Bankr. D. N.H. Mar. 25, 2002) (citing Schiappa v. Nat'l Marine

Underwriters, Inc., 1999 Mass. App. Div. 122 (1999)).

Not all acts of conversion constitute a willful and malicious injury to property for

the purpose of § 523(a)(6). Davis v. Aetna Acceptance Co., 293 U.S. 328, 331–32, 55 S.Ct.

151, 79 L.Ed. 393 (1934) (decided under former Bankruptcy Act of 1898). The Supreme

Court in Davis stated:

> [A] willful and malicious injury does not follow as of course from every act
> of conversion, without reference to the circumstances. There may be a
> conversion which is innocent or technical, an unauthorized assumption of
> dominion without willfulness or malice. There may be an honest but
> mistaken belief, engendered by a course of dealing, that powers have been
> enlarged or incapacities removed. In these and like cases, what is done is a
> tort, but not a willful and malicious one.

Davis, 293 U.S. at 332, 55 S.Ct. 151 (internal citations omitted). See also Ocean Equity

Group v. Wooten (In re Wooten), 423 B.R. 108, 132 (Bankr. E.D. Va. 2010) ("Cases

subsequent to Geiger that have considered whether acts of conversion constitute willful

and malicious injury focus on the distinction between whether the conversion was an intentional one or merely a reckless or negligent conversion of property.").

2. Analysis

Reed introduced no evidence that Zak personally intended to injure her or that cessation of the business of LMG was without a business justification. Zak testified that inquiries from the Attorney Generals of Massachusetts and Rhode Island as to the collection of advance fees by LMG triggered his decision to close LMG. While those reasons may have been warranted from a business judgment point of view, this Court has concluded that they were insufficient to deprive Reed of her share of the profits from the loan modification business. It is undisputed that Zak caused profits to which Reed would have been entitled to be diverted to ZLO. Zak, through LMG, exerted dominion and control over her share of the profits of their loan modification partnership. Zak abruptly removed Reed from the premises of the loan modification business and usurped her share of the profits, despite receipt of Reed's January 8, 2010 letter advising Zak of his responsibilities under partnership law. His decision and the resulting injury was intentional, not reckless. Under the circumstances, the Court concludes that Reed established that Zak willfully and maliciously converted her property, namely her share of their partnership profits, which the jury in the United States District Court action determined to be $324,000. Accordingly, this debt is excepted from discharge under § 523(a)(6).

D. § 523(a)(2)(A)

1. Applicable Law

Reed also seeks an exception to Zak's discharge based upon the "actual fraud"

component of § 523(a)(2)(A), relying upon Husky Int'l Elecs., Inc. v. Ritz, __ U.S. __, 136

S.Ct. 1581 (2016).[16]   To establish a debt for "actual fraud," a plaintiff must show that a

---

[16] In Husky Int'l Elecs., Inc. v. Ritz, the Supreme Court summarized the applicable facts
as follows:

Husky International Electronics, Inc., is a Colorado-based supplier of
components used in electronic devices. Between 2003 and 2007, Husky sold
its products to Chrysalis Manufacturing Corp., and Chrysalis incurred a
debt to Husky of $163,999.38. During the same period, respondent Daniel
Lee Ritz, Jr., served as a director of Chrysalis and owned at least 30% of
Chrysalis' common stock.

All parties agree that between 2006 and 2007, Ritz drained Chrysalis of
assets it could have used to pay its debts to creditors like Husky by
transferring large sums of Chrysalis' funds to other entities Ritz controlled.
For instance—and Ritz' actions were by no means limited to these
examples—Ritz transferred $52,600 to CapNet Risk Management, Inc., a
company he owned in full; $121,831 to CapNet Securities Corp., a company
in which he owned an 85% interest; and $99,386.90 to Dynalyst
Manufacturing Corp., a company in which he owned a 25% interest.

In May 2009, Husky filed a lawsuit against Ritz seeking to hold him
personally responsible for Chrysalis' $163,999.38 debt. Husky argued that
Ritz' intercompany-transfer scheme was "actual fraud" for purposes of a
Texas law that allows creditors to hold shareholders responsible for
corporate debt. See Tex. Bus. Orgs. Code Ann. § 21.223(b) (West 2012). In
December 2009, Ritz filed for Chapter 7 bankruptcy in the United States
Bankruptcy Court for the Southern District of Texas. Husky then initiated
an adversarial proceeding in Ritz' bankruptcy case again seeking to hold
Ritz personally liable for Chrysalis' debt. Husky also contended that Ritz
could not discharge that debt in bankruptcy because the same
intercompany-transfer scheme constituted "actual fraud" under 11 U.S.C. §
523(a)(2)(A)'s exemption to discharge.

debtor committed an act that "counts as 'fraud' and is done with wrongful intent . . . ."

<u>Husky Intern. Elec., Inc. v. Ritz</u>, 136 S.Ct. at 1586.[17]   It can be "effected without a false

representation."  <u>Id.</u>  The Supreme Court explained that "[a]lthough 'fraud' connotes

deception or trickery generally, the term is difficult to define more precisely."  <u>Id.</u>  *See*

<u>Above-All Transp. v. Fraher (In re Fraher)</u>, No. AP 14-01201-MSH, 2017 WL 715059, at *5

(B.A.P. 1st Cir. Feb. 21, 2017).   In <u>Husky</u>, the Supreme Court observed:

> It is of course true that the transferor does not "obtai[n]" debts in a
> fraudulent conveyance. But the recipient of the transfer—who, with the
> requisite intent, also commits fraud—can "obtai[n]" assets "by" his or her
> participation in the fraud. *See, e.g.,* <u>McClellan v. Cantrell</u>, 217 F.3d 890
> (C.A.7 2000); *see also supra*, at 1587 – 1588. *If that recipient later files for*
> *bankruptcy, any debts "traceable to" the fraudulent conveyance, see* <u>Field</u>, 516
> U.S., at 61, 116 S.Ct. 437; post, at 1591, will be nondischargable [sic] under §
> 523(a)(2)(A). Thus, at least sometimes a debt "obtained by" a fraudulent
> conveyance scheme could be nondischargeable under § 523(a)(2)(A). Such
> circumstances may be rare because a person who receives fraudulently
> conveyed assets is not necessarily (or even likely to be) a debtor on the verge
> of bankruptcy, but they make clear that fraudulent conveyances are not
> wholly incompatible with the "obtained by" requirement.

---

136 S.Ct. at 1585.  The district court had held that Ritz was personally liable for the debt
under Texas law, but that the debt was not "obtained by . . . actual fraud" under §
523(a)(2)(A) and could be discharged in his bankruptcy.  The Supreme Court reversed.

[17] The Court stated:

> This Court has historically construed the terms in § 523(a)(2)(A) to contain
> the "elements that the common law has defined them to include." <u>Field v.</u>
> <u>Mans</u>, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). "Actual fraud"
> has two parts: actual and fraud. The word "actual" has a simple meaning
> in the context of common-law fraud: It denotes any fraud that "involv[es]
> moral turpitude or intentional wrong." <u>Neal v. Clark</u>, 95 U.S. 704, 709, 24
> L.Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or
> fraud "in law," which describe acts of deception that "may exist without
> the imputation of bad faith or immorality." <u>Ibid.</u> Thus, anything that counts
> as "fraud" and is done with wrongful intent is "actual fraud."

136 S.Ct. at 1589 (emphasis supplied, footnote omitted).

2. Analysis

In her brief, Reed contends that Zak breached both his fiduciary duty and duty of

loyalty to LMG by taking revenues, due and owing to LMG, and diverting those revenues

to an entity he controlled, ZLO, for his personal financial advantage.  She argues:

> The transactions at issue also constitute fraudulent conveyances and actual
> fraud because the defendant was, in essence, transferring all the revenues,
> assets and business of LMG to an entity he controlled for no consideration,
> enabling him to reap considerable financial benefit he was not entitled to in
> light of the partnership agreement. The plaintiff maintains that the
> defendant stopped depositing revenue from the home loan modification
> business into LMG accounts because the plaintiff was asserting her
> partnership interests.
>
> In summary, the defendant managed to personally abscond with the net
> profits of the home loan modification business, rightfully belonging to the
> plaintiff, to her detriment, by fraud, fraudulent conveyance, breach of
> fiduciary duty, and a breach of good faith and loyalty.

Zak counters that he would have had no reason to know during the first three months of

2010 that moving assets from LMG to ZLO would result in Reed being unable to satisfy

a judgment and that he "had no reason to know in 2010 that later events would play out

this way in 2011, and his actions back then could not have been intended to capitalize on

such a situation and do not constitute actual fraud."

As noted above, the jury in the United States District Court action determined that

Reed was entitled to $18,000 per month for 18 months as her share of partnership profits

from LMG.  Reed recognized that LMG routinely transferred those profits to ZLO (indeed

she or her nominees were paid by checks issued by ZLO) and ZLO distributed the profits

to her until her ouster.  In her state court action, Reed asserted that LMG transferred

profits to ZLO and Zak and that Zak knew those profits were fraudulently transferred.

Nevertheless, under <u>Husky</u>, Reed was required to establish a debt "traceable to" the

fraudulent conveyance. This means that she was required to prove that the transfers to

Zak were in a liquidated amount and were attributable to a debt for actual fraud. In this

regard, Reed submitted evidence that she was entitled to $324,000 in profits from LMG,

and this Court has determined that with the implied consent of the Defendant sufficient

evidence was submitted to enable this Court to find that Zak was the alter ego of LMG,

that LMG was the vehicle for the loan modification business, as well as a vehicle for

concealing Reed's involvement in the business and providing a veneer of legality for the

collection of advanced fees from clients. With respect to her § 523(a)(2)(A) count,

however, Reed did not produce evidence of payments after January 5, 2010 directly made

by LMG to Zak or payments directly made by LMG to ZLO and then by ZLO to Zak,

although as the sole owner on paper of LMG and ZLO, any partnership profits garnered

by the loan modification business would inevitably inure to his benefit.

Reed asserts that Zak's liability flows from his participation in the fraudulent

transfers, both as the sole principal of LMG, and as the sole principal of ZLO, and due to

his status as the ultimate transferee. She adds that "[u]nder the law of fraudulent

conveyance in Massachusetts, transferees not acting in good faith are liable to the

creditor, in this case the plaintiff." She asserts that Zak's conduct satisfies "many of the

statutory requirements for establishment of fraudulent transfers," citing Mass. Gen. Laws

ch. 109A, § 5. The Court agrees. The burden shifted to Zak, and he failed to produce any

evidence as to the accounting of funds unlawfully transferred.

The Court accepts Reed's argument that ZLO was the recipient of the fraudulent transfers and that because Zak was the sole principal of ZLO, any net profit derived by the principal of the corporation must be attributable, at least in part, to the revenues derived from the fraudulent transfers.   Although Reed did not submit the tax returns for ZLO or Zak for 2010 or any subsequent years, she did submit evidence that the total revenues of ZLO were $1,596,777.00, in 2010 with a net profit of $72,884.00, but she failed to submit proof of how much of that sum should be attributable to a debt for actual fraud. In other words, the Court concludes that Reed established that Zak defalcated while acting in a fiduciary capacity by failing to account for her share of profits in the sum of $324,000, and that he converted her share of profits in the sum of $324,000, but she did not trace how Zak disposed of those sums.  For the purposes of §533(a)(2)(A), she did not trace the monies to any personal bank accounts he controlled or held and thus did not sustain her burden of proving an exception to discharge under § 523(a)(2)(A).

E. § 727(a)(3)

In the "Wherefore" clause of her Amended Complaint, Reed asks this Court to deny the Debtor a discharge under 11 U.S.C. § 727(a)(3), (a)(5) and/or (a)(6)(A) which pertain to whether the debtor has concealed or destroyed recorded information from which the debtor's financial condition or business transaction can be ascertained; whether the debtor has failed to explain satisfactorily any loss of assets; and whether the debtor has refused to obey any lawful order of the court, respectively.  Reed introduced no evidence with respect to those grounds for denial of Zak's discharge, and she did not

argue the merits of those claims in her brief.  Accordingly, the Court concludes Reed

waived those claims which are not set forth in any counts to her Amended Complaint.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of Reed and

against Zak under 11 U.S.C. § 523(a)(4) and (a)(6).  The Court shall enter a judgment in

favor of Zak and against Reed under 11 U.S.C. § 523(a)(2)(A) and § 727(a).

By the Court,

Dated:  July 12, 2017                           Joan N. Feeney
                                                United States Bankruptcy Judge